## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SALVATORE FACCIPONTE, JR.,** | : | No. 3:09cv1584 |
| **Individually and as Co-Administrator** | : | |
| **of the Estate of Salvatore** | : | **(Judge Munley)** |
| **Facciponte, III, deceased;** | : | |
| **DEBORAH P. FACCIPONTE,** | : | |
| **Individually and as Co-Administrator** | : | |
| **of the Estate of Salvatore Facciponte,** | : | |
| **III, deceased;** | : | |
| **STEVEN JAY LARSON, Individually** | : | |
| **and as Co-Administrator of the** | : | |
| **Estate of Andrew Thomas Larson,** | : | |
| **deceased;** | : | |
| **MARY AGNES HIGGINS-LARSON, as** | : | |
| **Co-Administrator of the Estate of** | : | |
| **Andrew Thomas Larson;** | : | |
| **MICHAEL F. McGOVERN, SR.,** | : | |
| **Individually and as Co-Administrator** | : | |
| **of the Estate of Michael F. McGovern,** | : | |
| **Jr., deceased;** | : | |
| **THERESA L. MCGOVERN,** | : | |
| **Individually and as Co-Administrator** | : | |
| **of the Estate of Michael F. McGovern,** | : | |
| **Jr., deceased; and** | : | |
| **MARY ANN WATT,** | : | |
| **Individually and as Administrator** | : | |
| **of the Estate of Michael P. Hopkins,** | : | |
| **deceased,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BRIGGS & STRATTON** | : | |
| **CORPORATION; and** | : | |
| **TRUE VALUE COMPANY,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the court are motions for summary judgment by defendants and joinder defendants. Having been fully briefed, the matters are ripe for disposition.

**Background**

This cases arises from the tragic death of four young men, Salvatore Facciponte III, Andrew Larson, Michael McGovern, Jr. and Michael Hopkins, on February 9, 2008. The previous day, Andrew Larson had borrowed a portable generator owned by his father, a contractor. (Statement of Material Facts of Third-Party Defendants Steven and Mary-Agnes Larson (hereinafter "Larson Statement") (Doc. 39) at ¶ 8). Andrew Larson and his three friends wanted to use the generator to provide power at a residential home in East Stroudsburg, Pennsylvania. (Id.; Statement of Uncontested Facts of Defendants Briggs & Stratton Company and True Value Company (hereinafter "Defendants' Statement") (Doc. 46) at ¶ 18). Michael Hopkins had inherited this home from his grandmother and hoped to be able to reside there. (Larson Statement at ¶ 10). The home needed cleaning before it could be inhabited, however, and Hopkins's friends Facciponte, Larson and McGovern volunteered to assist in the cleanup. (Id. at ¶¶ 10, 12). As the home had been vacant for some time, no electrical service existed, and the young men may have intended to use the generator to provide such power. (Id. at ¶¶ 13-14).[1]

---

[1] Defendants dispute the Larsons' assertion that the young men planned to use the generator to provide electricity for the home, and that no such electricity was available. (See Defendants' Response to Steven and Mary-Agnes Larson's statement of material

Andrew Larson brought the generator in a van owned by his father to the home in East Stroudsburg. (Id. at ¶ 15). At some time during the night and early morning of February 8-9, 2008, the four young men were overcome by carbon monoxide fumes in the home. (Id. at ¶ 16). All four died. (Id.). Tests performed by the fire department when they arrived on the scene indicated very high levels of carbon monoxide in the home, especially on the upper floor where the mens' bodies were found. (Id. at ¶ 17; Defendants' Response to the Larsons at ¶ 17). Though police and other public safety officers performed a detailed investigation at the scene, there were no eyewitnesses to the events that led to the young mens' deaths. (Larsons' Statements at ¶ 18).

Fire department officers found the generator in a room on the lower floor of the residence that opened to the exterior of the home. (Id. at 19).[2] The generator was

_____

facts (Hereinafter "Defendant's Response to the Larsons") (Doc. 56) at ¶ 14). Defendants correctly note that the evidence indicates that Adrew Larson did not explain directly to his mother why he wanted to borrow the generator. At the same time, however, police reports indicate that when officers arrived on the scene they discovered the generator on the lower level of the house, an electrical chord leading to the other level, where the decedents were found. A power strip was connected to the electrical chord, and an electric heater plugged into the power strip. Whether or not the men intended to use the generator to provide electric power seems only vaguely material to the questions at issue in the litigation, since the evidence would indicate that whatever their stated intention, the men did use the generator to provide electrical power to the residence.

[2]The parties dispute whether the room where the generator was found should be called a "breezeway" or a "mudroom." The defendants insist on calling the space a "mudroom." (See Larsons' Statement at ¶ 19; Defendants' Response to the Larsons at ¶ 19). A breezeway is "a roofed often open passage connecting two buildings (as a house and garage) or halves of a building. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed.) (Springfield, Mass., 1999). A mud room is " a room in a house designed esp. for the shedding of dirty or wet footwear and clothing and located typically off the kitchen or in the

behind a closed exterior storm door.  (Id. at ¶ 21).  Investigators also found a

propane tank near this door, leading them to conclude that the tank may have been

used to prop open the exterior door.  (Id. at 22).  The tank may have fallen away,

causing the door to close.  (Id.).  No direct evidence exists to determine how the

generator and propane tank ended up where they did.  (Id. at ¶ 20).  Defendants

insist, however, that circumstantial evidence exists by which a reasonable person

could conclude that Andrew Larson placed the generator in that room.  (Defendants'

Statement at ¶ 20).  The defendants point to evidence that: Steven Larson, Andrew

Larson's father, owned the generator; Steven Larson had taught his son to use the

generator; Andrew had used the generator several times while working with his

father on carpentry jobs; Andrew had told his mother he needed to use the generator

in the days before the incident; Andrew assured his mother that his father would

approve of his use of the generator; Andrew apparently brought the generator to the

home in East Stroudsburg; none of the other decedents had used a generator

before; the Larsons' expert witnesses reported that Andrew, as the only person on

the scene with knowledge of how the device worked, likely "had major influence"

over where to place the generator.  (Id.).  The Larsons also insist that no evidence

exists to demonstrate that Andrew Larson knew of the dangers of positioning the

---

basement."  Id.   Neither of these terms seem accurately to describe the area in question.
The room was certainly not an open passage that connected two parts of the home, but no
evidence indicates that the room was designed to be a place for removing dirty exterior
clothing.

generator where investigators found it.  (Id. at ¶ 26).  Pointing to the evidence recited above, defendants insist that Andrew Larson likely played a major role in determining where to place the generator.  (Defendants' Response to the Larsons at ¶ 26).

Steven Larson, Andrew's father, had purchased the gas-powered generator from a local hardware store in 2005.  (Defendants' Statement at ¶ 3).  He used the generator several times at construction sites, and at least twice at his own home.  (Id. at ¶ 11).  Plaintiffs contend that the generator was sometimes used in a small shed or had a roof over it.  (Plaintiffs' Response at ¶ 11).  Larson showed his wife Mary-Agnes how to start the generator, though plaintiffs insist that he never told her of any particular danger with running the generator inside.  (Defendants' Statement at ¶ 12; Plaintiffs' Response at ¶ 12).  Plaintiffs contend that Mary-Agnes Larson ran the generator outside the home because she did not like the noise or filth the machine generated, and not because she appreciated the danger carbon monoxide poisoning the device carried.  (Id.).   Steven Larson showed his son how to start the generator.  (Defendants' Statement at ¶ 13).  Plaintiffs contend that Larson never explained the danger of carbon monoxide poisoning presented by the generator, and that he operated the machine eight to ten times around his son, usually in a van with the side doors open or in a garage, with the garage door open.  (Plaintiffs' Response at ¶ 13).

A few days before the incident that is the subject of the lawsuit, Andrew

Larson asked his mother if his father would mind if he used the generator. (Defendants' Statement at ¶ 16).  The parties disagree about the nature of the conversation the two had surrounding Andrew's use of the machine.  Defendants contend that Mary-Agnes Larson told her son to use the generator outside, and he responded that he knew he should do so.  (Id. at ¶ 17).  Plaintiffs insist, however, that this conversation did not amount to an "explicit warning" about the danger of carbon monoxide poisoning, which Mary-Agnes Larson testified she did not understand.  (Plaintiffs' Statement at ¶ 17).

The parties also disagree about the extent to which Andrew Larson understood he should not use a generator inside.  Defendants argue that Steven Larson testified that he thought Andrew was aware of the dangers of carbon monoxide exhaust.  (Defendants' Statement at ¶ 19).  Plaintiffs respond that Steven Larson's testimony indicates that Andrew was not aware that running the machine in an enclosed space with a door propped open could be a danger, just that the gas itself could cause injury.  (Plaintiffs' Response at ¶ 19).  Andrew's father, after all, had used the generator inside closed spaces with the doors propped open.  (Id. at ¶ 20).

None of the other decedents had ever used a portable generator. (Defendant's Statement at ¶ 26).  A day or two before the accident, however, Salvatore Facciponte, III, asked his father for a gas can for filling the portable generator.  (Id. at ¶ 21).  The parties dispute exactly what Salvatore Facciponte, Jr.,

6

told his son about using a gasoline-powered generator.  Plaintiff Salvatore Facciponte, Jr. admits that he told an investigator during a police interview that he told his son not to run the machine inside.  (Salvitore Facciponte Jr.'s Statement of Material Facts (hereinafter "Facciponte Statement") (Doc. 41-2) at ¶ 9).  Facciponte contends that this statement came as a part of a discussion about how much noise the machine made while running.  (Id. at ¶ 9).  Plaintiff also contends that he told his son to shut the machine off if a neighbor complained about the noise it made.  (Id.).  Defendants argue that evidence indicates that Facciponte told the police investigator he had warned his son that running the generator inside the house could be deadly.  (Defendants' Statement in Response to Salavtore Facciponte's Statement of Material Facts (hereinafter "Defendants' Response to Facciponte") (Doc. 59) at ¶ 11).

Michael Hopkins's sister, Plaintiff Margaret Ann Watt, went searching for her brother at the residence in East Stroudsburg on the after of February 9, 2008.  (Defendants' Statement at ¶ 28).  She discovered the bodies of the four young men in the living room of the home's second floor.  (Id.).  Watt immediately called the police, and members of the Pennsylvania State Police and the Marshall Creek Fire Department soon arrived to conduct an investigation.  (Id. at ¶ 29).  All four men were pronounced dead at the scene, and the coroner listed the cause of their deaths as carbon monoxide toxicity.  (Id. at ¶ 30).  When police and fire personnel arrived at the scene, all of the doors and windows in the home were closed, including the door

leading outside from the room where the generator stood.  (Id. at ¶ 31).  They also

found the generator turned on, though out of gas and not running.  (Id. at ¶ 32).  An

extension chord ran from the generator to a power strip on the home's second floor,

near where the men's bodies were found.  (Id.).

The generator in question had warning labels attached to it.  (Id. at ¶ 33).  One

label, affixed to the engine, read "'WARNING' 'Engines emit carbon monoxide, DO

NOT run in enclosed area.'" (Id.).  Plaintiffs contend that this label was small, affixed

on the engine towards the back of the generator, and was the only label referencing

carbon monoxide toxicity.  (Plaintiff's Response to Defendants' Statement of Material

Facts (hereinafter "Plaintiff's Response") (Doc. 58) at ¶ 33).  Another label attached

to the generator stated "'READ OWNER'S MANUAL COMPLETELY BEFORE

OPERATING GENERATOR.'" (Defendants' Statement at ¶ 33).  A third label near

the generator's engine urged users to "Read and follow operating instructions before

running engine."  (Id.).  The parties agree that a fourth warning label, which was

supposed to be affixed on top of the generator and was to read "Engines emit

carbon monoxide, DO NOT run in enclosed area," was not present when

investigators recovered the unit.  (Id. at ¶ 34).  Plaintiffs insist that the generator left

the assembly line without this label attached.  (Id.).

Plaintiffs filed a complaint for wrongful death and survival actions in this court

on August 17, 2009.  (Doc. 1).  The complaint consists of twelve counts.  Count I,

against Defendant Briggs & Stratton Corporation, raises a wrongful death of action

claim for negligence through failure to warn decedents of the dangers of operating the machine as they did. Count II, likewise brought against Briggs & Stratton, is a survival action for negligence. Count III raises a wrongful death action for strict liability in tort against Briggs & Stratton. Count IV is a survival action for strict liability in Tort against Briggs & Stratton. Count V and VI are wrongful death and survival action breach of warranty claims against Briggs & Stratton. Counts VII through XII raise the same claims against Defendant True Value Company.

On November 30, 2009, the court approved a stipulation between the parties to this case. (Doc. 11). The stipulation severed the claims of Plaintiffs Salvatore and Deborah Facciponte and Steven and Mary-Agnes Larson from the rest of the claims in the action. (Id.). The stipulation also permitted the defendants to join the Faccipontes and Larsons as third-party defendants to this case, and permitted those plaintiffs to file a separate action. (Id.). These plaintiffs then filed that separate complaint in this court on December 16, 2009. (See Doc. 1 in Case No. 09cv2483). The complaint contains the same counts as the complaint in this case, but does not include as plaintiffs the next-of-kin of Michael F. McGovern, Jr. and Michael Hopkins. (See Id.). On February 12, 2010 Defendants True Value and Briggs & Stratton filed a third-party complaint that named as defendants Plaintiffs Salvatore and Deborah Facciponte and Steve and Mary-Agnes Larson. (See Doc. 16 in Case No. 09cv1584). That complaint contains two negligence counts, one against the estate of Salvatore Facciponte III and the other against the estate of Andrew Larson. (Id.).

9

On March 24, 2010, the court approved a stipulation between the parties to consolidate these cases. (See Doc. 10 in Case No. 09cv2483).

The parties then engaged in discovery. At the close of the discovery process, all of the defendants, including the third-party defendants, filed motions for summary judgment. The parties then briefed the issues, bringing the case to its present posture.

**Jurisdiction**

Plaintiffs and decedents are citizens of Pennsylvania. Defendant Briggs & Stratton is a Wisconsin Corporation with its principal place of business in that state. Defendant True Value is a Delaware Corporation with its principal place of business in Illinois. The amount in controversy exceeds $75,000. The court therefore has jurisdiction to 28 U.S.C. § 1332. The court is sitting in diversity, and therefore the substantive law of Pennsylvania shall apply. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

Defendants and third-party defendants move for summary judgment on plaintiffs' and counter-plaintiffs' claims. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his

standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  <u>Id.</u>  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986).

**Discussion**

Defendants offer several grounds for granting them summary judgment.  The court will address each of the motions in turn, as appropropriate.

**A.  Motion of Defendants Briggs & Stratton and True Value**

**1.  Proximate Cause**

Defendants Briggs & Stratton and True Value first argue that the court should

grant them summary judgment on all of plaintiffs' claims because they cannot establish that defendants' alleged negligence, whether failure to warn or in the form of products liability, was the proximate cause of the young men's demise.  They assert that the proximate cause of decedents' death was Andrew Larson's failure to heed warnings affixed to the generator and thus summary judgment is appropriate in this case.  Defendants point out that the warnings on the generator stressed the danger of running the engine in an enclosed space, and that the warnings also directed the user to the owners manual, which offered an even more specific warning about the dangers of using the engine inside any structure.

In Pennsylvania, claims of negligence, whether brought as strict liability, breach of warranty, or traditional negligence actions, require a demonstration that defendant's conduct was the proximate cause of plaintiff's injuries before liability can attach.  See, e.g., Steamfitters Union No. 420 Welfare Fund v. Philip Morris, 171 F.3d 912, 939 n.23 (3d Cir. 1999); Davis v. Berwind Corp., 690 A.2d 186, 190 (Pa. 1997) (holding that recovery in products liability requires a showing "that the product was defective, that the defect was a proximate cause of the plaintiff's injuries, and that the defect causing the injury existed at the time the product left the seller's hands."); Skipworth v. Lead Indus. Ass'n, 690 A.2d 169, 172 (Pa. 1997) (holding that "Pennsylvania . . . follows the general rule that a plaintiff, in order to recover, must establish that a particular defendant's negligence was the proximate cause of her injuries."); AM/PM Franchise Ass'n v. Atlantic Richfield Co., 584 A.2d 915, 923 n.12

(Pa. 1990).

Courts in Pennsylvania have concluded that "the mere existence of negligence and the occurrence of injury are insufficient to impose liability upon anyone. There remains to be proved the vitally important link of causation." Cuthbert v. Philadelphia, 609 A.2d 261, 263 (Pa. 1965). Thus, "even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury. Stated another way, the defendant's conduct must be shown to have been the proximate cause of plaintiff's injury." Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978). "Proximate cause is a term of art denoting the point at which legal responsibility attaches for the harm to another arising out of some act of defendant." Id. "In order for negligent conduct to be a proximate cause of an injury it must be a substantial factual cause of the injury for which damages are sought." Pascal v. Carter, 647 A.2d 231, 233 (Pa. Super. Ct. 1994). "The defendant's negligent conduct may not, however, be found to be a substantial cause where the plaintiff's injury would have been sustained even in the absence of the actor's negligence." Id.

Defendants argue that Andrew Larson failed to heed the warnings affixed to the generator and this failure was the proximate cause of the deaths in this case. They address these arguments in the context of court decisions addressing the sufficiency of the evidence in products-liability cases involving failures to warn

13

consumers of the dangers inherent in products. Courts have concluded that "an otherwise properly designed product may still be unreasonably dangerous (and therefore 'defective') for strict liability purposes if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers of the product." Pavlik v. Lane Limited/Tobacco Exporters Int'l, 135 F.3d 876, 881 (3d Cir. 1997). In such "failure-to-warn" cases, the plaintiff proves proximate cause by "establish[ing] that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries." Id. "To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury." Id.

Here, plaintiff has produced three expert reports on the incident. (Exhs. A-C to Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 55)). In his report, David G. Penney, Ph.D., concludes that the decedents experienced "pain and suffering" before they died, and that "from a public health, not engineering perspective, the generator unit was flawed in terms of life and health of users and others in its vicinity." (Exh. A at 56). Moreover, "the warning labels, designed to be affixed to the unit, and found in the operating manual, used flawed, confusing, non-standard pictograms and inadequate language, increasing the risk of injury or death for users." (Id.). Penney also finds other aspects of the directions confusing in way that could "suggest to users that the generator" could be used

14

inside with proper ventilation.  (Id.).

The expert report of Gary Sheesley, P.E., likewise lays blame for the young men's deaths on inadequate warnings.  (See Exh. B. to plaintiffs' brief (Doc. 55)). Sheesley's report addresses the sufficiency of the warnings and the dangers of inadequate warning labels.  Sheesley notes that "Carbon monoxide (CO) is a lethal poison that can rapidly accumulate even in areas that might appear to be well ventilated as it is approximately the same density as air."  (Sheesley Report, Exh. B., at 10).  The "colorless, tasteless, odorless, and nonirritating" nature of CO gas means that a person can be overcome "without warning."  (Id.).  Generating "weakness and confusion," the gas makes victims unable "to seek safety."  (Id.).  CO gas "replaces oxygen in red blood cells and prevents blood from absorbing oxygen even if the victim is moved to fresh air."  (Id.).  Thus, Sheesley concludes, "it is essential that CO warnings be prominent and forceful."  (Id.).

Sheesley also notes that the door to the entranceway was closed when firefighters arrived, with a propane tank near the outside door on its side.  (Id.). Sheesley agrees with firefighter's speculation that the decedents may have used the tank to prop open the door, since Andrew Larson had used generators before with his father and "has some awareness that generators should be used in a 'ventilated' space."  (Id.).  Sheesley also opines it "likely that Andrew thought that a generator placed in an open mud room approximately 50 feet away from the room where he and his friends slept would not cause any problems."  (Id. at 11).  Since decedents

had seventy-five feet of extension cord, they could have "place[d] the generator outside the mud room or at some location away from the house." (Id.). Sheesley concludes that "Andrew Larson and his friends were not able to learn about the danger of CO, or of the actions they needed to take to avoid those dangers, because the labels concerned with CO on the incident generator were missing and/or inadequate." (Id.). According to Sheesley's report, a warning label designed to be affixed to the top of the generator was missing at the time of the incident, and the report points to circumstantial evidence indicating that "the generator went into the box without the crucial CO warning." (Id. at 13). Moreover, Sheesley opines, the warning label that should have been placed on the generator was inadequate for several reasons, including a failure to inform users of the deadly nature of CO, a failure to make the warning of CO prominent enough, a failure to use the word "danger" instead of the word "warning" when describing CO, and the use of colors that were not strong enough. (Id. at 13-14). Sheesley also finds that another warning affixed to the generator was insufficient, too small and not containing enough information and the dangers of carbon monoxide. (Id. at 14). Thus, Sheesley concludes that "four young men died because they were not adequately informed about the deadly nature of the CO gas produced by the generator they were using." (Id.).

The report of consulting engineer Ezra S. Krendel likewise addresses the adequacy of the warnings provided with the generator. (See Exh. C to Doc. 55).

16

Krendel examines the generator and the warning labels in detail, explaining how they fall short of safety standards. Krendel finds the labels wanting, concluding that "[t]he WARNING label meant to be on the [generator] was inadequate" and that the product was "defective" because of that inadequate warning label. (Id. at 12).

The court concludes that the plaintiffs have provided sufficient evidence to survive a motion for summary judgment on this point. The expert reports provide evidence of the insufficiency of the warnings and allow a reasonable inference–not just a guess–that the existence of an adequate warning might have prevented the injury. See Pavlik, 135 F.3d at 881 ("To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury." Id. If the jury accepts this evidence, then defendants' failure to warn left the decedents unaware of the dangers of operating the machine in the manner they did and that failure-to-warn is the proximate cause of decedents' passing. Had they operated the machine outside, they would not have been overcome by carbon monoxide gas and they would not have died. The court will deny defendants' motion on these grounds.

Defendants also argue that Andrew Larson's alleged failure to heed the warnings on the generator means that they cannot be liable for any alleged negligence or defective product. They claim that because a manufacturer is entitled under Pennsylvania law to presume that warnings attached to their products will be

obeyed, the court must assume that Larson understood the danger of running the generator inside and ignored it.  Under Pennsylvania law,  "'[w]here warning is given the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.'" Gingus v. Gilbes & Ransome, Inc., 868 A.2d 459, 463 (Pa. Super. Ct. 2005) (quoting Baldino v. Castagna, 478 A.2d 807, 811 (Pa. 1984)).  Moreover, "'[t]he law presumes that warnings will be obeyed.'" Id. (quoting Davis v. Berwind Corp., 690 A.2d 186, 190 (Pa. 1997)).  The problem with defendants' argument, however, is that evidence exists which indicates that the warnings on the generator were inadequate, and did not properly advise users of the dangers of running such a machine.  As such, while defendants may be entitled to assume that decedents read the warnings on their machine, if those warnings were inadequate, liability can still attach.  The court will deny the motion on these grounds.

Defendants also argue that Andrew Larson was aware of the dangers of operating a generator inside, and thus any failure to warn is immaterial.  "For the plaintiff in a failure-to-warn claim to establish . . . causation, the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller."  Phillips v. A-Best Brands, 665 A.2d 1167, 1171 (Pa. 1995).  Courts have therefore found that a plaintiff cannot prevail in a failure-to-warn case when the evidence indicates that he knew or should have known of the danger inherent in the product, even absent a warning.  Sherk v. Daisy-Heddon, Div. of

Victor Comptometer Corp., 450 A.2d 615, 618 (Pa. 1982) (finding that "[w]here, as here, the lethal propensity of a gun was known or should have been known to the user, liability cannot be imposed upon the manufacturer merely because the manufacturer allegedly has failed to warn of that propensity."); see also, Overpick v. Chicago Pneumatic Tool Co., 634 F. Supp. 638, 641 (E.D. Pa. 1986) ("The mere presentation of evidence that various warnings could or should have been given does not constitute evidence that they would have had any effect; without evidence that these warnings would have prevented the harm, to permit the jury to draw such an inference allows a jury impermissibly to base its verdict on mere speculation.").

Defendants point to a variety of evidence which they claim indicates Andrew Larson and Salvatore Facciponte III were aware of the dangers of operating the generator where investigators found it.[3] Defendants point to testimony summarized above from Andrew Larson's parents. According to Mary-Agnes Larson, she told her son that he should use the generator outside on the day before he borrowed the machine. The report of a State Trooper also indicates that Michael Hopkins admitted that his son was aware of the dangers of using a generator inside. Defendants likewise point out that there is evidence indicating that Salvatore

[3]The court notes that defendants do not point to any evidence indicating that Michael McGovern, Jr. and Michael Hopkins were aware in any way of operating the generator where investigators found the machine. The record does not reveal any such evidence. In that case, even if the court were to conclude that summary judgment were appropriate on the Facciponte and Larson claims, the court would not grant summary judgment with respect to McGovern and Hopkins on these grounds.

Facciponte, Jr. had warned his son not to run the generator inside.

The court finds this evidence is equivocal and creates a question of fact for the jury as to the nature of the warnings decedents received. As explained above, there are disputed questions of fact as to the meaning of the conversations between decedents and their parents. There is also evidence that Andrew Larson's father had run the generator inside a garage and a van without incident; such evidence indicates that he himself may not have been aware of the danger of running a generator in such spaces. If the jury finds that the warnings given by the Larsons and Salvatore Facciponte, Jr. did not adequately convey the risk of running the generator where it was found, then a jury could conclude that the failure-to-warn was the proximate cause of the young men's deaths. Conversely, if the jury concludes that the warnings by their parents to Andrew Larson and Salvatore Facciponte III provided them knowledge sufficient to know the dangers of operating the generator in the place they did, then the jury could conclude that failure-to-warn was not the cause of their deaths. These are questions of fact for the jury, however, and the court will deny the motion for summary judgment on these grounds.

## 2. Strict Products Liability

The defendants next argue that the court should grant summary judgment on plaintiff's strict products liability claims. They argue that nothing in the evidence indicates that the product was unreasonably dangerous when it was installed.

### a. Risk/Utility Factors

20

This case involves a claim of strict products liability.  As a preliminary matter, "the Pennsylvania Supreme Court has remained faithful to its view that negligence concepts have no place in a products liability trial."  Habecker v. Clark Equip. Co., 36 F.3d 278, 282 (3d Cir. 1994).  Thus, "[t]he test for defectiveness is whether the 'product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use.'"  Id. (quoting Azzarello v. Black Bros. Co., 391 A.2d 1020, 1027 (Pa. 1978)).  To prevail on a products liability claim, a plaintiff must demonstrate "that: (1) the product was defective, (2) the defect existed while the product was in control of the manufacturer, and (3) the defect was the proximate cause of the injuries."  Id. at 284.  Pennsylvania courts have found "that a product is defective when it is not fit for the intended use for which it was sold."  Colville v. Crown Equip. Corp., 809 A.2d 916, 922 (Pa. Super. Ct. 2002).  Further, "'the intended use of a product includes all those [uses] which are reasonably foreseeable to the seller."  Parks v. Allied Signal, 113 F.3d 1327, 1331 (3d Cir. 1997) (quoting Pacheco v. Coats Co., Inc., 26 F.3d 418, 422 (3d Cir. 1994)) (internal quotations omitted).

Courts in Pennsylvania have found that "strict liability allows recovery when a defective product that is 'unreasonably dangerous' causes harm to a user or consumer."  Moyer v. United Dominion Indus., 473 F.3d 532, 538 (3d Cir. 2006) (citing Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1170 (Pa. 1995)).  The decision of whether a product is unreasonably dangerous is a question of law, and thus left to

the court rather than to the jury.  Id.  Therefore, "in a strict product liability action, before the case can be placed before the jury, the judge must make a threshold determination whether the defect alleged, if proven, would render the product 'unreasonably dangerous" as the term is defined in the Restatement (Second) of Torts § 402A."  Barker v. Deere & Co., 60 F.3d 158, 166 (3d Cir. 1995).  To do so, a court must "'engage in a risk-utility analysis, weighing a product's harms against its social utility.'"  Id.  (quoting Surace v. Caterpillar, Inc., 111 F.3d 1039, 1044 (3d Cir. 1997)).  A number of factors are relevant to this analysis:

> (1) The usefulness and desirability of the product–its utility to the user and to the public as a whole; (2) The safety aspects of the product–the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Id. (quoting Surace, 111 F.3d at 1046).

In making this determination, "'the court must first view the evidence in the light most favorable to the plaintiff.'"  Barker, 60 F.3d at 166 (quoting Burch v. Sears, Roebuck and Co., 467 A.2d 615, 618-19 (Pa. Super. Ct. 1983)).

Neither party has addressed these factors in their briefs.  As the defendants are the moving party, the court will assume that defendants have chosen not to address the factors.  The court therefore concludes from this omission that

22

defendants agree that the alleged defect–a failure to warn users about the dangers of running the generator in a closed space–would, if proven, make the generator unreasonably dangerous.  This conclusion appears inescapable in any case: lack of a proper warning about the dangers of running the generator inside as a part of the product's design could lead to unnecessary deaths.  A product with that feature is unreasonably dangerous.

The specific product defect alleged here is failure to provide an adequate warning.  Because of the way the defendants have argued their case, the court has already addressed the issue of proximate cause and warnings attached to the generator.  The court adopts the reasoning expressed earlier and concludes that plaintiff has presented sufficient evidence that inadequate warning was a proximate cause of decedents injuries.

### b.  Defendants' Arguments

Defendants True Value and Briggs & Stratton premise their argument that they are not subject to strict products liability on two factors.  The court will address each in turn.

### i.  The Decedents' Use of the Generator was Unintended

The defendants insist that plaintiffs' use of the generator was not an intended one, and therefore strict products liability is inapplicable in this case.  They argue that the generator was never intended for use indoors, and that warnings on the machine and in the owners' manner establish this fact.  Because the decedents used

the generator inside a home, their use was unintended and defendants therefore cannot be liable for strict liability claims on this matter.

Pennsylvania courts have found "that a manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer." Pa. Dept. of Gen. Servs. v. United States Mineral Prods. Co., 898 A.2d 590, 600 (Pa. 2006). Courts have "construed the intended use criterion strictly, holding that foreseeable misuse of a product will not support a strict liability claim." Id. at 601.

Defendants cite to two cases in making their argument that decedents' use of the generator in the entranceway to the home was not an intended use and therefore not subject to strict products liability. Both these cases are easily distinguishable.

In Weiner v. American Honda Motor Co., 718 A.2d 305 (Pa. Super. Ct. 1998), plaintiff sued the maker of his girlfriend's two-door Acura hatchback after he drove the car through a stop sign and ran head-on into a guardrail. Id. at 306. Plaintiff and his girlfriend were transporting a 180-pound cannister of pressurized nitrous oxide gas in the car, and had folded down the rear seats to make the cannister fit. Id. at 307. He sued in products liability, alleging defective design and failure-to-warn. Id. Plaintiff argued that the car should have been equipped with devices preventing the cargo from moving inside the vehicle during transport, as well as "warnings inside the vehicle limiting the size and weight of transportable cargo and the risks of such

24

transport." Id. The Pennsylvania Superior Court agreed with the trial court that plaintiff could not prevail on his claim of design defect based on defendant's failure to include cargo tie-downs. Id. The court noted that "[a]lthough it is true that the lack of proper safety devices can constitute a design defect . . . 'this rule should apply to allow recovery where the absence of the safety device caused an accidental injury which was of the type that could be expected from the normal use of the product.'" Id. (quoting Bartkewich v. Billinger, 247 A.2d 603, 605-06 (Pa. 1968)). The "manufacturer is entitled to believe that the product will be used in the usual manner, and 'need not be the insurer for the extraordinary risks an operator might choose to take.'" Weiner 718 A.2d at 309 (quoting Id.). The court concluded that the car was not designed to carry lightweight items such as groceries and golf bags, but "that the intended use of the Acura's cargo compartment was not for the transport of commercial or industrial items or other items similar to the instant 4 ½ foot, 180-pound cannister." Id. Thus, "[t]o find the Acura . . . defective and unreasonably dangerous . . . simply because such cargo was capable of fitting inside the vehicle . . . would place [defendant] in the position of being an insurer of safety with no consideration given to the intended use of the vehicle in its cargo area." Id

The facts in this case are different. In Weiner, the plaintiff argued that the failure to add tie-downs or straps to hold cargo in place inside the Acura constituted a design defect. The court rejected this argument, since the cargo straps would only be necessary in a vehicle designed to carry heavy, industrial-style cargo. The

25

evidence indicated that the car, a two-door vehicle, had been designed only to transport light-weight material. Tie-downs were not necessary to prevent items like golf clubs, shopping bags, or groceries from sliding and causing injury to drivers or passengers. Thus, the alleged defect was not related to the intended use of the product. Here, the evidence indicates that, unlike the driver in Weiner who used the car in a fashion not contemplated during its design, decedents used the generator for its intended purpose, providing electricity in a home where no electricity was available. They apparently used the generator in an improper place and were allegedly not given proper warning about the dangers of such use. The young men did not, however, use the device for an improper or unintended purpose.

In Pennsylvania Dept. of Gen. Servs. v. United States Mineral Products Co., 898 A.2d 590 (Pa. 2006), plaintiff, a state agency, sued the manufacturer of building materials after a fire in an office building led to the release of dangerous "synthetic chemicals [which were] detected on surfaces and in ambient air inside the Building." Id. at 593. Plaintiffs alleged that "asbestos-containing fireproofing . . . was the source of the" dangerous chemicals and sued the companies alleged to have manufactured and installed this material. Id. at 593-94. The jury returned a verdict for the plaintiff, and defendant appealed. Id. at 595. At trial, defendant proposed a jury instruction that "distinguish[ed] between PCB contamination resulting from the June-1994 fire, and contamination resulting from ordinary use of the PCB-containing building materials." Id. at 600. The instruction stated that "Under Pennsylvania law,

subjecting a product to a fire is an abnormal use, not an intended use, of a product. If you find that, without the fire, the products in question would not have made the . . . building unsafe, then you cannot find that the products were defective for their intended use when sold." Id. Discussing Pennsylvania court's clear instructions that "negligence-based concepts have no place in strict liability," the court concluded that since "it is indisputed that the incineration of building products is not a use intended by the manufacturer . . . damages in strict liability are unavailable for the fire-related contamination." Id. at 259. The court ordered a new trial so the jury could evaluate defendant's "evidence that the spread of PCBs throughout the Building resulted from the fire, and therefore, no liability without fault could ensue." Id.

The facts in this case are also different from those in United States Mineral Products Co.. The concern for the court in that case was to avoid importing the negligence concept of forseeability into a strict products liability case. The plaintiff's injury had been caused by the release of dangerous chemicals into the building. Evidence existed by which a jury could conclude that those chemicals would not have been released but for a fire that damaged the building. Even though fire could be foreseeable, if fire were the only reason for the release of the chemicals, then the product itself could not be defective. Here, defendants' argument is that the machine was not designed to be run inside, and thus even a foreseeable injury from being run inside could not make the defendant liable.

This case is different for two reasons. First, the alleged design defect is an

inadequate warning as part of the product's design.  Plaintiffs have evidence in the form of expert reports that allege that the warning as designed was inadequate, rendering the product unreasonably dangerous.  Courts have also found that "[a] dangerous product can be considered 'defective' for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product."  Davis v. Berwind Corp., 690 A.2d 186, 190 (Pa. 1997) (quoting Mackowick v. Westinghouse Electric Corporation, 575 A.2d 100 (Pa. 1990)).  Second, the evidence indicates that the decedents' demise came while they used the machine for its intended purpose: providing electrical power in situations where such power is otherwise unavailable, both inside and outside of buildings. The young men were found in a room in a home that lacked other electrical power. An extension chord connected a power strip to the generator, and an electric heater was plugged into the power strip.  The decedents' use of the generator was thus for exactly its intended purpose.

Indeed, the defendants' argument attempts to import a negligence concept–contributory negligence–into a dispute over a strict liability claim.  "The key inquiry in all products liability cases," however, "is whether or not there is a defect–it is the product, and not the defendant's conduct, that is on trial."  Reott v. Asia Trend, Inc., 7 A.3d 830, 836 (Pa. Supert Ct. 2009).  As such, "evidence of a plaintiff's contributory negligence is generally inadmissible."  Id.  Such concepts may appear "[i]n certain limited circumstances . . .  specifically where the defendant alleges that

28

the plaintiff's voluntary assumption of risk, product misuse, or highly reckless conduct is relevant to the issue of causation." Id. at 9. Here, the defendants allege product misuse as the cause of decedents' demise, not the alleged design defect. As explained above, there is an issue of fact as to whether decedents' conduct or defendants' failure-to-warn caused the decedents' deaths. Defendants may of course make their argument about contributory negligence at trial, but such alleged misuse is not grounds for granting summary judgment. The court will deny the motion on these grounds.

### ii. Claims of Facciponte, McGovern and Watt

Defendants also argue that they should be entitled to summary judgment on the claims of Plaintiffs Facciponte, McGovern and Watt. They insist that strict liability applies only to the user or consumer of a product, and not to a bystander. Defendants insist that only Andrew Larson was the user or consumer of the product, since the product belonged to his father and he had borrowed the generator to be used in the home that night. Facciponte, McGovern and Watt, defendants argue, were not the intended users of the product, and thus defendants cannot be liable to them on these claims.

The court rejects this argument as well. "[I]n a strict liability design defect claim, the plaintiff must establish that the product was unsafe for its intended user . . . [but] a manufacturer will not be held strictly liable for failing to design a product that was safe for use by any reasonably foreseeable user as such a standard would

improperly import negligence concepts into strict liability law." Philips v. Cricket Lighters, 841 A.2d 1000, 107 (Pa. 2003). Defendants argue that only Andrew Larson had ever started the generator, and that only he knew how to start the generator. As such, the evidence indicates that only Andrew Larson was a user or consumer of the product. The facts of the case, viewed in the light most favorable to the non-moving parties, do not establish that the decedents other than Adam Larson were not the users of the product. No evidence exists as to who started the machine or placed the generator where firefighters found it. Moreover, the generator is designed to provide electrical power in buildings and other spaces where such power is otherwise unavailable. When investigators discovered the decedents, they were together in a room with a portable heater, plugged into the generator. They were clearly using the generator to provide electrical power when they died, whoever had originally been sold the generator and whoever started the machine. Defendants appear to attempt to restrict the meaning of "user" to the person who started the machine. A "user" is "a person or thing that uses." WEBSTER'S NEW WORLD DICTIONARY, 3d Ed. (New York, 1994). To use is "to employ for or apply to a given purpose." Id. The court finds that all of the decedents were the intended users of the product, designed to provide them with the electricity they were using. The court will deny the motion on these grounds as well.

### B. Motion of Third-Party Defendants Steven Jay and Mary-Agnes Larson

The nature of the complaint against third-party defendants Steven Jay and

Mary-Agnes Larson is that the negligence of their son, Andrew Larson, caused the death of the young men by placing the generator inside the entranceway to the home and starting the engine. Since Andrew Larson had used the generator before and had been warned to some degree about the dangers of running that device inside, he breached his duty to the other young men and should be liable. The Larsons argue that no evidence exists which could support a negligence claim against their son through them. No evidence exists to determine who put the generator in the location where investigators found it, and no evidence exists by which a jury could conclude that Andrew Larson did so. A jury could only find negligence on Andrew's part through conjecture, which is prohibited under Pennsylvania law.

Under Pennsylvania law, negligence occurs when "'the defendant had a duty to conform to a certain standard of conduct; . . . the defendant breached that duty; [and] such breach caused the injury in question; and actual loss or damage.'" Wisniski v. Brown & Brown Ins. Co. of Pennsylvania, 906 A.2d 571, 575-76 (Pa. Super. Ct. 2006) (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1008 (Pa. 2003)). The argument in this case is over whether evidence exists for causation; the third-party defendants insist that no evidence exists to determine who placed the generator in a dangerous place, and that without that evidence a jury could not conclude that Andrew Larson's negligence was a cause of the injuries the young men suffered.

"A verdict may not be supported where the jury must guess at any essential fact in favor of a party having the burden of proving it." <u>Commonwealth v. Kelly</u>, 652 A.2d 378, 383 (Pa. Super. Ct. 1994).  Here, the jury has no evidence beyond speculation by which it could conclude that Andrew Larson placed the generator inside the entranceway to the home.  The jury would effectively have to guess that Larson, because he had operated a generator before, had to be the person to site the generator inside the entryway.  Likewise, no evidence exists of any statements Larson made to the other decedents about how or where they should use the generator.  A jury would have to guess about what was said, and who said it.  The alleged negligence in this case came when someone ran the generator in an unsafe place.  No survivor can testify as to who placed or directed that the generator be placed where it ended up, and thus no evidence exists by which the third-party plaintiffs could prove their claim that Larson breached a duty he may have had to the other decedents.  As such, no evidence exists by which third-party plaintiffs could prove their claim against Andrew Larson, and the court will grant the motion for summary judgment on these terms.

### C.  Motion of Third-Party Defendants Salvatore Facciponte, Jr. and Deborah Facciponte

Like the parents of Andrew Larson, the parents of decedent Salvatore Facciponte III seek summary judgment on third-party plaintiffs' negligence claims against their son.  They likewise argue that no evidence indicates that Salvatore

Facciponte III played any role in determining where to put the generator. For the same reasons that the court will grant the Larsons' motion, the court will grant that of the Faccipontes.[4]

**Conclusion**

For the reasons stated above, the court will deny the motion for summary judgment of Defendants Briggs & Stratton and True Value. The court will, however, grant the motions of Third-Party Defendants Steven and Mary-Agnes Larson and

---

[4]In response to the Faccipontes' motion for summary judgment, third-party plaintiffs argue that they should be allowed to dismiss their claim against Salvatore Facciponte III without prejudice. They argue that evidence in the case shows that only Andrew Larson operated the generator on the night in question. Since "there is currently no evidence showing that Salvatore Facciponte, III, operated the generator, Briggs & Stratton and True Value are moving" to have the complaint against Facciponte dismissed. (Doc. 60 at 7-8). Third-party plaintiffs argue that, as their claim against Facciponte is for contribution, and such claims mature only after a defendant is assessed a judgment by a jury or settles for damages, they should be able to raise their claim against Facciponte again if circumstances permit at the end of trial. They also argue that "at trial some evidence, albeit not yet disclosed, might be adduced showing that Salvatore Facciponte, III had a hand in negligently operating the subject generator." (Id. at 9). Federal Rule of Civil Procedure 41(a)(2) provides that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." FED. R. CIV. P. 41(A)(2). "Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice." Id. The court will deny this motion to dismiss the complaint. This case was filed more than eighteen months ago. The parties have engaged in extensive and costly discovery. Third-party plaintiffs admit that there is no evidence to support their claim, premised as it is on evidence that Salvatore Facciponte III operated the generator. Still, they hope that at trial evidence will somehow appear that establishes Facciponte's liability. The court finds that dismissing the claim pursuant to Rule 41(a)(2) would actually prejudice the third-party defendant, who could potentially be hauled into court again to defend against charges for which defendant admits discovery has produced no evidence. See, e.g., Ferguson v. Eakle, 492 F.2d 26, 29 (3d Cir. 1974) (finding an abuse of discretion to dismiss on plaintiff's motion because defendants were prejudiced when they "were hauled into court in April 1972 and required to retain counsel who removed to federal court and joined issue by filing an Answer and Counterclaim. By January of 1973, defendants had completed discovery and had had a pre-trial conference before a federal judge.")

33

Salvatore Facciponte, Jr., and Deborah Facciponte.  An appropriate order follows.

**SALVATORE FACCIPONTE, JR.,**   :    No. 3:09cv1584
**Individually and as Co-Administrator** :
**of the Estate of Salvatore**        :    **(Judge Munley)**
**Facciponte, III, deceased;**         :
**DEBORAH P. FACCIPONTE,**      :
**Individually and as Co-Administrator** :
**of the Estate of Salvatore Facciponte,** :
**III, deceased;**                    :
**STEVEN JAY LARSON, Individually** :
**and as Co-Administrator of the**     :
**Estate of Andrew Thomas Larson,** :
**deceased;**                       :
**MARY AGNES HIGGINS-LARSON, as** :
**Co-Administrator of the Estate of**   :
**Andrew Thomas Larson;**        :
**MICHAEL F. McGOVERN, SR.,**    :
**Individually and as Co-Administrator** :
**of the Estate of Michael F. McGovern,** :
**Jr., deceased;**                 :
**THERESA L. MCGOVERN,**       :
**Individually and as Co-Administrator** :
**of the Estate of Michael F. McGovern,** :
**Jr., deceased; and**            :
**MARY ANN WATT,**           :
**Individually and as Administrator**   :
**of the Estate of Michael P. Hopkins,** :
**deceased,**                      :
            **Plaintiffs**       :
                         :
       **v.**                  :
                         :
**BRIGGS & STRATTON**         :
**CORPORATION; and**           :
**TRUE VALUE COMPANY,**       :
           **Defendants**      :

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## **ORDER**

**AND NOW**, to wit, this 11th day of February 2011, the motion for summary

judgment by Defendants Briggs & Stratton and True Value, Inc. (Doc. 44) is hereby

**DENIED**.  The motion for summary judgment of Third-Party Defendants Steven and

Mary-Agnes Larson (Doc. 38) is hereby **GRANTED**.  The motion for summary

judgment of Third-Party Defendants Salvatore Facciponte, Jr. and Deborah

Facciponte (Doc. 41) is hereby **GRANTED**.


                              **BY THE COURT:**


                              **s/ James M. Munley**
                              **JUDGE JAMES M. MUNLEY**
                              **UNITED STATES DISTRICT COURT**