## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SALVATORE FACCIPONTE, JR.,** | : | **No. 3:09cv1584** |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Salvatore Facciponte, III,** | : | **(Judge Munley)** |
| **deceased; DEBORAH P. FACCIPONTE,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Salvatore Facciponte, III,** | : | |
| **deceased; STEVEN JAY LARSON,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Andrew Thomas Larson,** | : | |
| **deceased; MARY AGNES** | : | |
| **HIGGINS-LARSON, As Co-Administrator** | : | |
| **of the Estate of  Andrew Thomas Larson,** | : | |
| **deceased; MICHAEL F. McGOVERN, SR.,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Michael F. McGovern, Jr.,** | : | |
| **deceased; THERESA L. MCGOVERN,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Michael F. McGovern, Jr.,** | : | |
| **deceased; and MARY ANN WATT,** | : | |
| **Individually and as Administrator of the** | : | |
| **Estate of Michael P. Hopkins, deceased,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BRIGGS & STRATTON CORPORATION;** | : | |
| **and TRUE VALUE COMPANY,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the court are two motions.  The first is defendants' motion in limine to

bar evidence of Defendant True Value Company's failure to inspect or test the

generator.  (Doc. 80).  The second is defendants' motion for reconsideration of their

motion to exclude certain opinions of Dr. David G. Penny.  (Doc. 118).  Having been fully briefed, these matters are ripe for disposition.

**Background**

This cases arises from the death of four young men, Salvatore Facciponte III, Andrew Larson, Michael McGovern, Jr. and Michael Hopkins, on February 9, 2008. The young men died after using a gasoline-powered portable generator to provide electricity in a home.  Defendant Briggs & Stratton Corporation manufactured the generator at issue and Defendant True Value Company (hereinafter "True Value") distributed it.  Plaintiffs allege that failings in the design of the generator and defendants' failure to warn them about dangers from the generator caused the men's deaths.  These design failings allegedly caused the young men to be unaware of the dangers of running the generator in an enclosed space.

After the court denied defendants' motion for summary judgment, the parties filed motions in limine in anticipation of the pre-trial conference.  The court ruled on all of the parties' motions in limine with the exception of defendants' motion to exclude evidence of True Value's failure to inspect.  At the pre-trial conference, the court heard brief arguments on defendants' motion in limine to exclude evidence of True Value's failure to inspect.  The court also agreed, at the pre-trial conference, to entertain briefing on a motion for reconsideration of defendants' motion in limine with respect to certain opinions of Dr. David G. Penny.  The parties then briefed the issues, bringing the case to its present posture.

**Jurisdiction**

Plaintiffs and decedents are citizens of Pennsylvania.  Defendant Briggs & Stratton is a Wisconsin corporation with its principal place of business in that state.  Defendant True Value is a Delaware Corporation with its principal place of business in Illinois.  The amount in controversy exceeds $75,000.  The court therefore has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The court is sitting in diversity, and therefore the substantive law of Pennsylvania shall apply.  Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Discussion**

**A.  Motion to Exclude Evidence of True Value Company's Failure to Inspect the Subject Generator (Doc. 80)**

Defendants seek to exclude evidence of True Value's failure to inspect the generator in question before selling that generator to Steven Larson.  Defendants argue that plaintiffs should be prevented from "mentioning, relying on, or offering evidence regarding True Value's alleged failure to inspect or test the generator."[1] (Doc. 81, Defs.' Mem. of Law in Supp. of Mot. In Limine at 6).  Defendants contend

---

[1] Defendants' supplemental brief to the court on this issue concludes that "introduction of evidence by the Plaintiffs to the effect that True Value was negligent would be irrelevant and confusing to the jury and prejudicial to the Defendant."  (Doc. 118, Defs.' Supplemental Mem. of Law in Supp. of Mot. In Limine at 5).  This statement is broader than the request made in defendants' motion in limine, which was to bar only evidence of True Value's failure to inspect.  (See Doc. 80, Defs.' Mot. In Limine ¶ 6).  We will only address the evidence sought to be excluded in defendants' motion–evidence of True Value's failure to inspect–and not all evidence of True Value's alleged negligence.

that under Pennsylvania law True Value, as the distributor, had no duty to inspect or test the product and therefore cannot be liable under a negligence theory for failing to do so.  As such, defendants insist the evidence is minimally relevant and highly prejudicial.

Plaintiffs respond that True Value was aware of the generator's potential dangers and, therefore, should be imposed with the duty to inspect the generator before selling it.  Plaintiffs also argue that True Value contractually assumed the duty to inspect every generator it sells.

At issue here is whether True Value has a duty to inspect the generator in question, and, if not, whether our rules allow evidence of a distributor's failure to inspect in the absence of such a duty.  We hold that product distributors, such as True Value, have no such duty to inspect and that the rules of evidence forbid such evidence from being admitted to establish a distributor's negligence.

Pennsylvania law is clear, no duty to inspect for latent or hidden defects is imposed on product distributors.  See, e.g., Kratz v. Am. Stores Co., 59 A.2d 138, 139-40 (Pa. 1948) (holding that a stove polish retailer has no duty in negligence to inspect each cannister to ensure that the formula is safe); Johnston v. Dick, 165 A.2d 634, 644-45 (Pa. 1960) (holding that a kerosene vendor had no duty to inspect the kerosene prior to delivery to ensure that no gasoline had become mixed); McMeekin v. Gimbel Bros., Inc., 223 F. Supp. 896, 899 (W.D. Pa. 1963) (holding that a retailer has no duty to test or inspect each packaged rotary mower it offered for

sale); RESTATEMENT (SECOND) OF TORTS § 402 (1965) ("A seller of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by inspection or test of the chattel before selling it.").

The court rejects plaintiffs' argument that power generators are per se dangerous and that True Value has a duty to inspect every one prior to distribution. Although the tragedy of this accident cannot be overstated, we find that gasoline-powered portable power generators do not fall into the exception for known dangerous products found in section 402 of the Restatement (Second) of Torts. Similar to the Pennsylvania Supreme Court's finding in Johnston v. Dick with respect to kerosene fuel, the court finds that a gasoline-powered portable power generator may be dangerous or perfectly safe, depending on its use. Use specific danger is, in itself, not enough to support a finding that a product is per se dangerous. The court also rejects plaintiffs' argument that the law with respect to a distributor's duty to inspect has somehow changed. Plaintiffs point to no law to support this theory. If anything, recent developments in non-manufacturer products liability have focused on theories of strict products liability and not those of negligence.

Furthermore, plaintiffs also argue in their brief that True Value assumed the duty to inspect its products by executing the TruServ MSC Program Agreement-2004 (Doc. 100, Ex. C) (hereinafter "Program Agreement"); however, a plain reading

5

of the Program Agreement does not reveal this to be the case.  The Program

Agreement does not require True Value to inspect the products.  Rather, the

Program Agreement gives True Value the option to inspect the products to

determine whether or not that individual product should be returned to the

manufacturer.[2]  This contract is unremarkable.  It merely provides True Value with a

right of refusal.  No third-party beneficiaries are mentioned, and the language of the

agreement does not reflect an intent to assume a duty owed to public that is not

imposed by law.

For the above stated reasons, the court finds that True Value had no duty to

inspect the generator.  The danger complained of is an inadequate/missing warning

on a product that the manufacturer shipped in a sealed container.  If a product

danger is found to have existed, it is the type of hidden defect that a distributor has

no duty to inspect for under Pennsylvania law.  True Value cannot be negligent for

failing to inspect the generator where it had no duty to do so.

Therefore, evidence of True Value's failure to inspect is irrelevant because

plaintiff proffered that evidence to establish negligence, and, as stated above, True

---

[2] The Program Agreement provides in relevant part: "Products and services must conform to TruServ's specifications or descriptions.  All products and services are subject to final inspection and approval by TruServ at destination.  Items not accepted will be held for the Vendors disposition or returned to the Vendor, both at the Vendor's expense.  The Vendor is obligated to replace rejected products and services except when specifically notified in writing to the contrary by TruServ.  All concealed damage claims will be charged back to the Vendor.  Payments for any products or services shall not be deemed an acceptance.  Payments made to the vendor for products or services properly rejected by TruServ shall be immediately refused by TruServ."  (Doc. 100, Ex. C, TruServ MSC Program Agreement-2004 at 2).

Value's failure to inspect is not a fact that is of consequence to the determination of the action. FED. R. EVID. 401. Irrelevant evidence is not admissible. FED. R. EVID. 402. Thus, the court will grant defendants' motion and bar evidence of True Value's failure to investigate as irrelevant.

## B. Motion for Reconsideration of Defendants' Motion to Exclude Certain Opinions of Dr. David G. Penny (Doc. 118)

In their motion for reconsideration, defendants seek to convince the court that three opinions expressed by one of plaintiffs' experts, Dr. David G. Penny, should be precluded from evidence. The court denied defendants' first request to preclude these opinions, along with other opinions expressed by Dr. Penny. At the pre-trial conference, the court agreed to entertain a motion for reconsideration with respect to the admissibility of some of Dr. Penny's opinions. Specifically, in their motion for reconsideration, defendants contend that Dr. Penny should be precluded from providing his expert opinion on (1) whether the decedents were awake during the carbon monoxide intoxication, (2) whether the decedents experienced a state of "incapacitation" and (3) at what time the decedents died. For the following reasons, we will grant defendants' motion in part and deny it in part.

### I. Standard of Review for Expert Testimony

Federal Rule of Evidence 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education" may provide opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case." FED. R. EVID.

702.  Courts have described the function of the district court in determining whether

to admit expert testimony as a "gatekeeping" one.  The trial judge has "the task of

ensuring that an expert's testimony both rests on a reliable foundation and is

relevant to the task at hand."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579, 597 (1993).  Thus, "[t]he objective of that requirement is to ensure the

reliability and relevancy of expert testimony.  It is to make certain that an expert,

whether basing testimony upon professional studies or personal experience,

employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in a particular field."  Kumho Tire Co., Ltd. v. Carmichael, 526

U.S. 137, 152 (1999).  Three major requirements inform the analysis of proposed

expert testimony under Rule 702: "'(1) the proffered witness must be an expert, *i.e.*,

must be qualified; (2) the expert must testify about matters requiring scientific,

technical or specialized knowledge [, *i.e.,* reliability]; and (3) the expert's testimony

must assist the trier of fact [, *i.e.*, fit].'"  United States v. Schiff, 602 F.3d 152, 172 (3d

Cir. 2010) (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008)).

    First, in deciding whether an expert is qualified, courts are required to assess

whether the expert has specialized knowledge in his or her testimony, which may be

based in practical experience as well as academic training and credentials.  See

Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  The specialized

knowledge requirement has been interpreted liberally in the substantive as well as the formal qualification of experts; "'at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . .'" Id. (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).

Second, courts are charged with assessing the techniques and methodologies employed by the expert when determining the reliability of his proposed opinion. To qualify as reliable under Rule 407, the "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 742 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995) ("Paoli II") (quoting Daubert, 509 U.S. at 590). Essentially, "an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue–but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production." Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999). Furthermore, district courts are not tasked with determining the correctness of a proposed witness' opinion. Paoli II, 35 F.3d at 744 ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect."). As the Third Circuit Court of Appeals has noted:

> A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. He or she will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should

9

consider the evidence.

Id. at 744-45.

Third, Rule 702 requires that courts make a determination as to the "fit" of the expert testimony.  Courts ask "'whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute'" when assessing the fit of expert testimony.   Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'"  Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting Paoli II, 35 F.3d at 743).

### ii.  Dr. Penny's Opinion that Decedents were Awake During Carbon Monoxide Intoxication

Defendants first contend that Dr. Penny's methodology with respect to his expert opinion that the decedents were awake during the carbon monoxide intoxication should be precluded under Rule 702.  Dr. Penny states in his expert report that "three to four men definately appear to have been preparing to sleep before they died.  This means that three of the men were conscious for some period while they were going through the various stages of CO intoxication, before becoming completely unconscious and dying."  (Doc. 76, Ex. A, Penny Expert Report at 39-40).  At his deposition, Dr. Penny elaborated that his opinion is not

scientific, "[i]t's just an opinion."  (Doc. 76, Ex. B, Dr. Penny Dep. at 198).  Dr. Penny arrived at his opinion by looking at pictures of the decedents and noting that they were wearing shoes and appeared to be arranged in a way that indicated they were not sleeping.  (Id. at 197-98).

Defendants argue that Dr. Penny's opinion on whether the decedents were awake at the time of the carbon monoxide intoxication is nothing more than his reaction to the materials provided, and not, as Rule 702 and Daubert require, the product of a reliable, scientific methodology.  Plaintiffs' respond to this challenge by stating that Dr. Penny developed his expert opinion by reviewing the photographs, "which clearly show that the Plaintiffs' decedents were not positioned to sleep at the time of their tragic deaths."  (Doc. 103, Pls.' Reply & Br. in Opp'n to Defs.' Mot. to Exclude Certain Ops. of David G. Penny, Ph. D. at 4).

Upon reconsideration of the issue, the court agrees that Dr. Penny did not use a scientific methodology to arrive at the opinion that three of the decedents were awake when they began to suffer carbon monoxide intoxication.  Dr. Penny admitted at his deposition that he developed his opinion on whether decedents were awake by simply looking at the photographs, as any lay person would do.  The court finds that Dr. Penny's expert opinion on whether the decedents were awake at the time of their carbon monoxide intoxication is more the product of lay intuition than that of scientific methodology as required by Rule 702.  Furthermore, the court notes that Dr. Penny's expert opinion on whether the decedents were asleep prior to their

demise is unnecessary to assist the jury because the jury is able to examine the photographs and determine whether the evidence demonstrates that the decedents were awake prior to slipping into coma.

Therefore, for the above-stated reasons, Dr. Penny will be precluded from offering an expert opinion that the decedents were awake prior to the onset of carbon monoxide intoxication.  However, as will be explained below, this ruling does not impact Dr. Penny's ability to testify on the stage of "incapacitation" or the issue of pain and suffering.

### iii.  Dr. Penny's Opinion with Respect to a Period of "Incapacitation"

Defendants argue in their motion for reconsideration that Dr. Penny's opinion with respect to a period of "incapacitation" should be precluded under Rule 702. Defendants support this argument by attaching the affidavit of Dr. Michael Greenberg and the report of Dr. Stephen Thom.  Defendants argue that Dr. Penny's opinion does not meet the second requirement of Rule 702, that the expert opinion be the product of a reliable scientific methodology.  Defendants contend, with the support of Drs. Greenberg and Thom, that Dr. Penny's opinion is not reliable because it has not been peer reviewed, is not testable, is outside of generally accepted methods, and has an insufficient basis.  The court disagrees.  An analysis of Dr. Penny's opinion reveals that it satisfies the requirements of Rule 702 and that his methods are sufficiently reliable.  Unlike his opinion on whether the decedents were asleep in which Dr. Penny had no identifiable scientific methodology, Dr. Penny

provided a detailed explanation of the method he used to arrive at his expert opinion on the possibility of a period of incapacitation.  In the interests of a complete analysis of the issue, the court will examine whether Dr. Penny's opinion on incapacitation satisfies each of the three requirements of Rule 702.

Defendants do not contest Dr. Penny's qualification as an expert, and he thus satisfies the first requirement under Rule 702.  The court finds Dr. Penny is an expert in carbon monoxide toxicology.  He has studied toxicology and carbon monoxide for over forty-one years.  He has worked with the Federal Environmental Protection Agency, the World Health Organization, and the Centers for Disease Control among other organizations.  Dr. Penny has published over one hundred articles, over one-half of which are on carbon monoxide. Dr. Penny has also published three books in the area of carbon monoxide toxicity and safety, including one as recently as 2008.

With respect to the second prong of Rule 702, the court disagrees with defendants and finds that Dr. Penny's opinion is the product of a reliable scientific method.  In his report, Dr. Penny opined that the decedents went through six phases of carbon monoxide poisoning, including the forth stage of incapacitation, in which they experienced severe symptoms prior to falling into coma.  (Doc. 76, Ex. A, Penny Expert Report at 55-56).  Dr. Penny further opined that "the four decedents experienced pain and suffering at that location during the hours of CO intoxication while they were conscious." (Id. at 56).

Dr. Penny developed his six stage approach to carbon monoxide poisoning

after reviewing twenty-eight studies that chronicle the symptoms and signs of carbon monoxide poisoning in humans as well as animals.  (Id. at 45-50).  The human studies cited catalogue the symptoms experienced by victims of carbon monoxide exposure up to the point of rescue.  (Doc. 76, Ex. B, Dr. Penny Dep. at 236).  The animal studies record the physical effects of carbon monoxide exposure on animals through such techniques as electrocardiographic recordings.  (Id.)  Based on these animal studies, Dr. Penny was able to analogize how humans would react to similar levels of carbon.  (Id.)  Animal studies also demonstrated to Dr. Penny that animals were conscious but unable to escape during periods of carbon monoxide intoxication.  (Id. at 235-36).  Dr. Penny also relied, in part, on his own anecdotal interviews with individuals who were exposed to extreme levels of carbon monoxide prior to being rescued.  (Id.)  Dr. Penny's personal interviews with carbon monoxide victims who were rescued after approaching the doorstep of death are infrequent because incidents of such survival are rare and because survivors often have impaired memory.  (Id. at 239).

The court notes that Dr. Penny's opinion is the product of years of research, and that it was adapted from the stages identified in these studies.  The court also notes that testing Dr. Penny's hypothesis is impossible, as it would require human exposure to dangerous levels of carbon monoxide.  Dr. Penny's methodology–review of existing animal studies and the record of human victim interviews–is a reasonable way to study carbon monoxide exposure.  The court is unpersuaded by defendants'

14

argument that Dr. Penny's methodology is unreliable because it has not been tested.

Furthermore, the court is not moved by defendants criticism that the six-stage approach is unreliable because it has not been explicitly adopted by other academics.  While it has not been formally adopted, the court notes that Dr. Penny's theory on the six stages of carbon monoxide poisoning has not been refuted by his peers.  Additionally, while publication in a peer reviewed journal is relevant, it is not dispositive in determining the validity of a particular methodology.  See Daubert, 509 U.S. at 594.  The court is satisfied that Dr. Penny's extensive review of the existing literature and his personal interviews create a sufficiently reliable methodology.  Dr. Penny's unquestioned qualifications and professional stature as an expert in carbon monoxide toxicology also influence the court's finding that Dr. Penny has developed a methodology that will be helpful to the jury in understanding the effects of carbon monoxide poisoning.  See Paoli II, 35 F.3d 742 (citing United States v. Downing, 753 F.2d 1224, 1238-39 (3d Cir. 1985)).

As stated above, it is not the court's task to determine the correctness of an experts opinion, but merely to assess the methodology to determine if it is based on reliable principles and will assist the jury.  The court finds that the methodology used to develop Dr. Penny's opinion on the period of incapacitation meets this standard. Defendants' complaints are more with the adequacy of Dr. Penny's conclusions than with the sources for them.  Defendants may, with the support of their experts, make their arguments about the persuasiveness of Dr. Penny's opinions to the jury.

Although defendants only challenge Dr. Penny's methodology, the court also finds, in the interests of completeness, that Dr. Penny's testimony reasonably fits the issues in dispute.  Dr. Penny's expert testimony on whether the decedents experienced a period of incapacitation is relevant to the case if the jury finds that at least one of the decedents was awake during the carbon monoxide intoxication.  The rules of evidence allow the court to admit evidence that is conditional on the establishment of another fact if the evidence is sufficient to support that fact.  FED. R. EVID. 104(b).  The photographs and other circumstantial evidence surrounding the decedents' deaths are sufficient for the jury to find that at least one of the decedents was awake during the exposure to high levels of carbon monoxide.  Therefore, Dr. Penny's opinion on the incapacitation stage of carbon monoxide poisoning fits the facts of the case and satisfies the third requirement of Rule 702.

Thus, for the above-stated reasons, the court will deny defendants' motion for reconsideration with respect to Dr. David G. Penny's expert opinion on the incapacitation stage.

**iv.  Dr. Penny's Opinion on the Time of Death**

Defendants argue in their motion for reconsideration that Dr. Penny's opinion on the decedents' time of death should be precluded.  Defendants do not contest Dr. Penny's qualifications or the fit of his testimony to the case.  Rather, defendants contend, with the support of their experts, that the techniques used by Dr. Penny are insufficiently accurate and thus fail Rule 702's requirement for a reliable

methodology. The court disagrees. Again, unlike Dr. Penny's opinion on whether

the decedents were asleep, Dr. Penny has provided a detailed explanation of the

methodology he used to develop a time of death, a methodology the court finds

sufficiently reliable under Rule 702.

Dr. Penny explains in his expert report that his opinion is that the decedents

died in the early morning hours of Saturday, February 9, 2008. Dr. Penny explained

by stating in his report:

> When Mrs. Watt and Linda Chesko entered the house at 4:30 p.m. on
> Saturday, the decedent Salvatore Facciponte was said by them to be "stiff."
> This indicates that rigor mortis in the decedent was advanced. The fact
> would place the time of death 4-8 hours before 4:30 p.m., or in the range of
> 8:30 a.m. to 12:30 p.m. Thus, it is presumed death of the decedents
> occurred in the early morning hours of Saturday, February 9[th], 2010 (sic).

(Doc. 76, Ex. A, Penny Expert Report at 41). At his deposition, Dr. Penny

elaborated on how he arrived at this opinion. Dr. Penny explained that he based his

opinion on a combination of eyewitness testimony that reported rigor mortis and his

estimation of the minimal amount of time it would take for the generator to fill the

second floor of the house with a sufficient amount of carbon monoxide to produce

the level of carboxyhemoglobin measured in the decedents' blood. (Doc. 76, Ex. B,

Dr. Penny Dep. at 144, 166-67).

Dr. Penny arrived at the latter end of his time of death time frame (12:30 p.m.)

by examining eyewitness testimony that indicates that some rigor mortis sets in

throughout the entire body. (Id. at 167). Dr. Greenberg, defendants' expert, swore

in an affidavit that rigor mortis could reasonably estimate that the time of death

17

occurred as late as noon on February 9, 2008.  (Doc. 119, Ex. A, Aff. of Dr. Michael I. Greenberg at ¶ 16).  The methodology Dr. Penny used to arrive at the end of his time frame is therefore not disputed as Defendants' expert concurs.

The only real dispute defendants have with Dr. Penny's time frame is the methodology he used to develop his opinion with regard to the beginning of his time frame.  Dr. Penny arrived at this opinion by first calculating the amount of time it would have taken to fill the volume of the home with a sufficiently fatal level of carbon monoxide, provided that the power generator emits a comparable amount of carbon monoxide as power generators of a similar size.  (Id. at 94-95).  Then Dr. Penny analogized how long it would take for the second floor of the home to fill with carbon monoxide given the walls and other variables not present in the volume equation he computed.  (Id. at 172).  Dr. Penny used a Consumer Products Safety Commission report, which studied the spread of carbon monoxide in a two bedroom home by making use of a computer model, to assist in determining how long it would take for the carbon monoxide to travel.  (Id. at 118-19).  Dr. Penny also considered how long it would take the decedents to absorb carbon monoxide into their blood stream.  (Id. at 172).

The court is satisfied that this methodology, which Dr. Penny used to reach the conclusion that the time period in which decedents died begins at 8:30 a.m., is sufficiently reliable under Rule 702.  As is mentioned above, Dr. Penny has devoted years of study to carbon monoxide and how carbon monoxide poisoning occurs.  He

used his training in this field, as well as evidence found in the record, to opine that the generator, located in the mud room, would take several hours to produce a toxic level of carbon monoxide in the second floor of the home.  The court is satisfied that the methodology employed by Dr. Penny will be helpful to the jury in understanding how long it took for the carbon monoxide to travel and accumulate in the area where the decedents were found.

Defendants criticize Dr. Penny's opinion and point out that there is a margin of error inherent with his calculations that make it a theoretical possibility that the decedents could have died earlier in the morning.  The court finds that these points are better suited for cross-examination than the basis to exclude expert opinion.  As the Third Circuit explained, it is not the province of the district courts to ensure that expert methodology is perfect, only that it is good.  See Paoli II, 35 F.3d at 744. Thus, the jury shall be permitted to hear Dr. Penny's testimony on the time of death and assess whether potential variances make his opinion incorrect.

### v.  Request for a Daubert Hearing

Defendants request in their reply memoranda in support of their motion of reconsideration that "[s]hould the Court deny the pending motion on the current written record, the Defendants request an evidentiary *Daubert* hearing on the issue before trial." (Doc. 122, Defs.' Reply Mem. at 2).  The court will deny this request. The parties have submitted extensive and comprehensive briefs on this issue. Defendants have submitted the 270 page transcript of Dr. Penny's deposition as well

as an expert report from Dr. Thom and an affidavit by Dr. Greenberg.  The written record on the issues discussed here is extensive.  A hearing on the matter would serve no purpose other than to rehash the issues and arguments already presented before the court.  Thus, the court will deny defendants' request for a <u>Daubert</u> hearing as such a hearing would be redundant.

**Conclusion**

For the reasons stated above, the court will grant defendants' motion in limine to exclude evidence of Defendant True Value Company's failure to inspect and the court will grant in part and deny in part defendants' motion for reconsideration.  An appropriate order follows.

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SALVATORE FACCIPONTE, JR.,** | : | **No. 3:09cv1584** |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Salvatore Facciponte, III,** | : | **(Judge Munley)** |
| **deceased; DEBORAH P. FACCIPONTE,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Salvatore Facciponte, III,** | : | |
| **deceased; STEVEN JAY LARSON,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Andrew Thomas Larson,** | : | |
| **deceased; MARY AGNES** | : | |
| **HIGGINS-LARSON, As Co-Administrator** | : | |
| **of the Estate of  Andrew Thomas Larson,** | : | |
| **deceased; MICHAEL F. McGOVERN, SR.,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Michael F. McGovern, Jr.,** | : | |
| **deceased; THERESA L. MCGOVERN,** | : | |
| **Individually and as Co-Administrator of** | : | |
| **the Estate of Michael F. McGovern, Jr.,** | : | |
| **deceased; and MARY ANN WATT,** | : | |
| **Individually and as Administrator of the** | : | |
| **Estate of Michael P. Hopkins, deceased,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BRIGGS & STRATTON CORPORATION;** | : | |
| **and TRUE VALUE COMPANY,** | : | |
| **Defendants** | : | |

**ORDER**

**AND NOW**, to wit, this 17th day of October 2011, defendants' motions are

**GRANTED IN PART** and **DENIED IN PART** as follows:

21

1.  Defendants' motion in limine to preclude evidence of Defendant True Value Company's failure to inspect the subject generator (Doc. 80) is hereby **GRANTED**;

2.  Defendants' motion for reconsideration of their motion to exclude certain opinions of Dr. David G. Penny (Doc. 118) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

a.  Defendants' motion to reconsider with respect to Dr. Penny's expert opinion on whether the decedents were awake at the time of the carbon monoxide intoxication is hereby **GRANTED**;

b.  Defendants' motion to reconsider with respect to Dr. Penny's opinion on whether the decedents experienced a period of incapacitation is hereby **DENIED**;

c.  Defendants' motion to reconsider with respect to Dr. Penny's opinion on the time of death is hereby **DENIED**; and

d.  Defendants' motion for a <u>Daubert</u> hearing is hereby **DENIED**.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**